Bankruptcy ⬳184(2)—Claim under mortgage withheld from record, so as not to affect mortgagor's credit, properly expunged and disallowed.

Where mortgage was withheld from record, so as not to affect mortgagor's credit, claim thereunder was properly disallowed and expunged from record of trustee in bankruptcy.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore, in Bankruptcy.

In the matter of the bankruptcy of James Groome Steele. The claim of Omar D. Crothers was disallowed and expunged from the record of Morris A. Soper and others, trustees, by the referee and the District Court, and claimant appeals. Affirmed.

Isaac L. Straus, of Baltimore, Md., for appellant.

---

**JOHNSON AUTOMATIC SCALE CO., Limited, v. GINN, et al.**

(District Court, D. Massachusetts. January 29, 1926.)

No. 1804.

1. Patents ⬳328—1,158,186, for machine for wrapping cartons, claims 28 and 29, held valid and infringed.

Dearborn patent, No. 1,158,186, for machine for wrapping cartons, claims 28 and 29, *held* valid and infringed.

2. Patents ⬳328—1,158,186, for machine for wrapping cartons, claims 15, 16, 17, 18, 19, and 22, held invalid.

Dearborn patent, No. 1,158,186, for machine for wrapping cartons, claims 15, 16, 17, 18, 19, and 22, *held* invalid.

3. Patents ⬳12—Normal development of machinery should not be restricted by patents which do not involve real invention.

Normal development in modern machinery, as development through experience, ought not to be restricted by patents which do not involve real invention, but embody only what may be called natural improvements.

**4. Patents ☞118—Claims consisting of complicated elements are not favored by courts.**

Claims consisting of complicated elements, amounting to concise description of the machine of the patent, do not point out in any precise way as statute requires in what the invention consists, and are not favored by the courts.

**5. Patents ☞157(1)—Claim involving mechanism found in every sort of automatic machinery should not be broadened beyond its literal language.**

A claim involving mechanism found in almost every sort of automatic machinery, principles of which are perfectly understood by all designers of such machinery, should not be broadened beyond its literal language, nor held to cover devices of different operation.

**6. Patents ☞328—1,158,186, for machine for wrapping cartons, claim 26, held not infringed.**

Dearborn patent, 1,158,186, for machine for wrapping cartons, claim 26, *held* not infringed.

**7. Patents ☞129, 163—Employee, going with competitor after applying for patent, is estopped to deny patent is valid, and is bound by its claims according to its clear language.**

Where employee, after applying for patent, left his employment and went with competitor, he is estopped to deny that patent is valid according to its clear language, and is bound by claims as construed according to the usual rules.

**8. Patents ☞328—1,270,416, for machine for wrapping cartons, claims 8, 17, 18, 28, 29, 36, held not infringed.**

Johnson patent, No. 1,270,416, for machine for wrapping cartons, claims 8, 17, 18, 28, 29, 36, *held* not infringed.

**9. Patents ☞328—1,270,416 for machine for wrapping cartons, claim 35, held valid and infringed.**

Johnson patent, No. 1,270,416, for machine for wrapping cartons, claim 35 *held* valid and infringed.

In Equity. Patent infringement suit by the Johnson Automatic Scale Company, Limited, against Percy E. Ginn and others. Decree for plaintiff.

Horace Van Everen, of Boston, Mass., for plaintiff.

Nathan Heard and Frederick A. Tennant, both of Boston, Mass., for defendants.

MORTON, District Judge. This is a suit for infringement of letters patent to Dearborn, No. 1,158,186, dated October 26, 1915 (application May 29, 1914), and to Johnson, No. 1,270,416, dated June 25, 1918 (application January 30, 1915).

At the time when the first of the patents in suit (the Dearborn patent) was applied for there were successful machines for wrapping in wax paper loaves of bread, and small rectangular objects like caramels, packages of chewing gum, etc.; but there was no machine, so far as now appears, for wrapping cartons of ordinary commercial size. While to a large extent the problem of wrapping such cartons was similar to that of the other articles referred to, it was by no means identical. The problems were alike, in that all the machines had to handle each article separately, to feed and wrap around it a sheet of paper, to fold the ends of the paper, and finally to discharge the wrapped article, all of which had been done mechanically before Dearborn. Beyond this there were important differences. In wrapping bread, appearance is not of much importance; the essential thing being that the wrapping shall be complete and secure. In wrapping cartons, on the other hand, neatness of appearance is essential. As between small rectangular objects like caramels and the much larger cartons (the standard size of which is 3x6x9 inches), the difference in size and weight introduces elements of difficulty in designing the machine. It is to be remembered that the present method of selling food products in cartons had by no means reached its present vogue at the time in question (1913), although it was developing. In many country stores there was still the open cracker barrel, not far from the cheese. Successful automatic machinery for making, filling, and closing cartons was still recent. Wax wrapping was new, and the need of a wax-wrapping machine for completing cartons was not of long standing. Sevigné testifies—I think correctly—that his machine would wrap cartons; but for reasons herein suggested I do not think it would do it as well as the Dearborn machine.

Dearborn turned to the problem at the right time. He found already developed the basic ideas, as above noticed, on which the machine must rest, worked out in a variety of ways. He did not, however, find in the prior art any way of end-folding wax wrappers which would be satisfactory as applied to cartons. This, I think, was his major problem. The end fold around a loaf of bread is clumsy and ill-looking; the end fold on a caramel would be clumsy, if applied to a large object, and wasteful of paper. There was in the prior art a rotating end tucker and folder, invented by McGirr, which was a clever bit of inventive thought. McGirr patent, March 31, 1914, No. 1,091,684. McGirr seems not to have made practical use of his invention; possibly he did not put it into a

definitely workable design. But the inventive idea was clearly there, to be availed of by more persistent or skillful mechanics. The patent to Cowles and Hanford, dated March 14, 1911, also showed rotary tuckers and folders. Dearborn took the McGirr tucker and folder, redesigned it, modified the application of it, duplicated it for opposite ends of the carton, and put it into his carton-wrapping machine. The Dearborn machine, as described in his patent, involves many other points of invention, but none of them now appear to be of much importance, while his end-closing mechanism in its essential principle is found in all successful machines.

It is urged by the defendant that Dearborn's adaptation of the McGirr device was a mere mechanical alteration or use of an existing mechanism. A discussion of the point, if undertaken, would necessarily be extremely long and involved, and hardly understandable without elaborate drawings. I content myself with saying that the contention seems to me unsound. What Dearborn did was much more than a mechanical rearrangement of the McGirr patent, and involved real invention. Dearborn built a machine according to his patent; and it was in use in the Maple Flake factory from 1913 to 1917, where it ran at the rate of 30 cartons a minute. His patent is therefore entitled to a pretty broad construction of its claims which involve this element.

[1] The claims of the Dearborn patent which are specially directed to the end-folder mechanism are 28 and 29. In each it is explicitly stated that the end folders "oscillate." Dearborn's end folders were oscillated by a cam; in the defendants' machine, they revolve. The defendants contend that for this reason their machine does not infringe these claims. In each machine the end folders perform the same function in substantially the same way. The question is whether the patentee, having explicitly limited his claim to folders which "oscillate," should be allowed to enlarge them by claiming as equivalent a similar folder which revolves. It has been held in this circuit that the plain language of claims cannot be disregarded, however meritorious the invention. American Rolled Gold Leaf Co. v. W. H. Coe Mfg. Co., 212 F. 720, 129 C. C. A. 330. That case, however, was stronger for the defendant on the facts than the present one. There the machine of the patent itself made a lapping contact between the strips of gold, while in the machine of the defendant such contact was made by a manual movement of the operator. This, it was held, was not "automatic," within the meaning of the claim. No question of equivalents was involved. See, too, Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, 24 L. Ed. 344; White v. Dunbar, 119 U. S. 47, 7 S. Ct. 72, 30 L. Ed. 303. Considering the rather basic character of the Dearborn invention as to the end folders, it seems to me entitled to such a range of equivalents as includes an end folder of the same design and operating on the same principle, but returning to position by a forward rotating movement, instead of a backward oscillatory one. I do not find anything in the negotiations with the Patent Office which precludes the patentee from taking this position. I therefore am of opinion that these two claims are valid and infringed.

In any wrapping machine it is necessary that a sheet of paper be introduced, properly timed and positioned with respect to the package to be wrapped. It is apparent that, if paper be fed when there is no package, trouble will ensue. This has been recognized from the beginning of the wrapping-machine art. No machine could be successful as an automatic machine without some arrangement to prevent feeding paper unless a package was present. Potbury so arranged his caramel-wrapping machine in 1907, and Sevigné his bread-wrapping machine in 1912. In both of these machines the paper feed was intermittent, the feed rolls stopping after each sheet, and being set in motion again by the next article. Dearborn so timed his feed rolls and his carton-handling mechanism that he ran his rolls continuously as long as the stream of cartons was unbroken. This feature of the Dearborn machine is overemphasized, as I think, by the plaintiff's expert, whose testimony was at times lacking in candor and in correctness. However their operation be described, the fact is that all successful wrapping machines feed paper when there is an article to be wrapped, and do not do so when there is no article to be wrapped. In all of them the paper feed is set in motion by the articles, and is as continuous—broadly speaking—as the stream of them, and no more so. Whether the paper feed roll should be kept in constant rotation as long as the stream of cartons continues, being so timed with the rest of the machine that the paper is thus delivered at the right place at the right time and properly cut off, or whether the movement of the paper feed should be of intermittent character, is probably, in view of the great success of the intermittent Sevigne machine, a matter of no great practical importance.

The plaintiff dwells on the difficulty of handling rolls of paper weighing perhaps 200 pounds on an intermittent feed; but Sevigne finds no trouble in doing it. There is, I think, a balance of advantage in slowing the feed rolls, so that they run continuously when packages are going through, and adjusting the other parts of the machine with reference to such continuous running. Whether it constitutes invention is a close question. It is essentially a mechanical problem, a matter of machine design. The Sevigne machine had an intermittent feed, because the varying sizes of the loaves of bread required variation in the length of paper feed for each loaf; the Potbury machine, because its whole operation was step by step. Given a continuous movement of the article to be wrapped (after the wrapping begins), I rather think a continuous paper feed, properly timed, would be adopted as a matter of course. There are cases in this circuit in which it has been held that such improvements are not entitled to the rewards of patentable invention.

In all such machines it is, of course, necessary to put each article into step with the wrapping mechanism and to keep it so while it is conveyed through the machine. Dearborn did this by feeding the cartons on a belt and rollers, which brought them successively against a stop, which held them up until the lifting plunger was in position to receive the leading one. Then this stop, which also served as a detector, and in that function will be discussed later, yielded and allowed a carton to pass and take position over the lifting plunger. The paper having been fed over the top of the carton, the plunger pushed up the carton carrying the paper with it. This wrapped the top and sides. The carton was then seized by a moving arm having forked fingers, and carried through the wrapping mechanism.

The remaining claims (in suit) are seven in number, several of them of considerable length. All involve many elements; and the different elements themselves consist of trains of mechanism. It is impossible adequately to discuss such claims without the aid of numerous and rather complicated drawings, hardly practicable in an opinion. I will therefore content myself with a general statement of my conclusions about them.

Claim 15 is for the combination of continuously driven feed mechanism, conveyer mechanism, and wrapping and folding mechanism, with wrapper-feeding mechanism actuated by the packages to be wrapped and so arranged as to be stopped by the absence of packages; the first part of the combination continuing to run. With respect to this and the immediately following claims Dearborn said to the Patent Office:

"As pointed out in the previous amendment, in applicant's machine only the paper feeding mechanism and the bottom folder stop when the supply of packages ceases; while the other portions of the machine continue, being driven independently of the paper feeding mechanism and bottom folder. *In the prior patents of record, when the supply of packages ceased, the entire machine stops.*"

[2] There is dispute between the parties as to what "means for continuously driving" signifies in this claim. The plaintiff maintains that the expression is used to differentiate step by step machines like Potbury's. No such suggestion was made by Dearborn in the Patent Office. He supposed that he was the first to diassociate the driving of the paper feed from the rest of the machine, and to connect it therewith by a clutch actuated by the presence of a carton to be wrapped. This claim was drawn under that impression, and is to be construed accordingly. It signifies, as it seems to me, that the parts specified run as long as power is on the machine, regardless of the stopping and starting of the paper feed.

On this important point Dearborn was basically in error. He had in fact been anticipated both by Potbury and by Sevigné; but those patents were not, so far as I have discovered, cited to him by the Patent Office. This underlying mistake affects all his claims on this part of his machine. They are broad claims, which rested upon a foundation which proved unsound. If claim 15 was not technically anticipated, the subject-matter of it did not, in view of the prior art, amount to patentable invention.

[3] This and the immediately following claims involve perhaps the distinction between patentable invention and machine designing. The line between them is not easy to draw. The cases on the point are, from the nature of the question, apt to be so complicated in their facts as not to be of much help in later controversies. The design of machinery, as of other things, is constantly improving. The latest boat or the latest machine is apt to be the best of its kind. The modern locomotive is a great improvement on the early types, but no radical invention made it so. It represents principally a development through experience. The same

sort of thing has occurred and is occurring in other arts. This normal development ought not to be restricted by patents which do not involve real invention, but embody only what may be called natural improvements. Obviously the drive for the paper feed could be taken, and its clutch located, at any point in the machine between the main belt and the paper-feed rolls. The clutch controls whatever mechanism is beyond it, and does not affect what is between it and the drive. It seems to me that placing the clutch so that it controlled only the paper feed was, when first done, probably a matter of arrangement or design, rather than of invention, and that thereafter it was clearly so.

Claims 16 and 17 are combination claims of the same general character, and are disposed of by what has been said as to claim 15.

Claim 18 is for a combination of conveyer mechanism, wrapping mechanism, paper-feed mechanism, driving mechanism for the paper feed, controlled by a detector, "the engagement of [which] by a package will set the paper-feed means in operation," and folding mechanism, with means to drive the folding mechanism "continuously and independently of" the paper feed. It may be noticed in passing, as bearing on the testimony of the plaintiff's expert, that this claim refers to the action of the detector as *"setting the paper feed in operation."*

This claim brings in the detector. The gist of it is a paper feed controlled by a detector stop motion, in combination with folding devices not so controlled; i. e., with folding mechanism which runs as long as power is on the machine. The detector mechanism as described in this claim is found in Potbury and Sevigné, and the first part of the combination—i. e., the entire claim, except the last two lines—is readable on those patents and on almost any wrapping machine. The validity of this claim depends on whether it was invention to arrange a paper feed, clutch, and detector stop motion, all of which were old, so that the clutch controlled only the paper feed. It is covered by what has been said.

Claim 19 is a broader claim than 18, of the same general character. Claim 22 is essentially for the combination of continuously driven folding devices and a paper feed disconnectibly driven therefrom, with a mechanism actuated by the in-coming packages to maintain a driving connection from the folder mechanism to the paper-feed rolls. For reasons already suggested, it seems to me invalid.

[4-6] Claim 26: This claim consists of 10 complicated elements. It amounts to a concise description of the machine of the patent. Such claims do not point out in any precise way, as the statute requires, in what the invention consists, and they are not favored by the courts. The last element is the detector.

As the defendants contend that their detector is essentially different from that of the patent, it is necessary to discuss this element with some detail. Every paper-feed stop motion had to have some kind of detector mechanism actuated by the presence or absence of a package to be wrapped. This is true of Potbury and Sevigné. Detector mechanisms and stop mechanisms have as many forms as Proteus and are found in almost every sort of automatic machinery. The principles underlying them are perfectly understood by all designers of such machinery. Under such circumstances, a claim should not be broadened beyond its literal language, nor held to cover devices of different operation. In the plaintiff's patent the forward movement of the carton against the detector pushes it out of the way, when it is not locked and serving to position the cartons for the plunger as above described, and this movement of it actuates mechanism which keeps the paper feed running.

In the defendants' device a rotating cam acting against a spring keeps, through intervening mechanism, the finger of the detector moving in and out of the path of the cartons. When a carton is presented, the feeler, striking the side of it, is arrested in its forward movement before it reaches the point where it throws out the paper-feed clutch; the result being that the clutch remains in engagement and the paper is fed. The push of the carton has nothing to do with the operation of the defendants' detector, while in the patent this push is essential to its operation, and the detector is constructed and interrelated with other parts, so as to serve as a positioning stop to put the on-coming cartons into step with the machine. This latter function is essential; it is not and could not be performed by the defendants' detector. I therefore conclude that the defendants' machine does not have the last element of this claim. In certain particulars the defendants' mechanism is practically a copy of the patent, and, if a wide range of equivalents were permissible, I should say that the defendants' device infringes. But on this point I do not

think that the plaintiff's patent should be broadened beyond the language of the claim. This claim is not infringed.

[7] As to the Johnson patent: This patent was applied for by the defendant Johnson while he was working for the plaintiff. It was still in the Patent Office when he left the plaintiff's employ and went with the defendants; some of its claims were inserted after that date. He is estopped to deny that it is valid according to its clear language. United Printing Machinery Co. v. Cross Paper-Feeder Co., 227 F. 600, 142 C. C. A. 232 (C. C. A. 1st). Where its claims are not clear, he is entitled to have them construed according to the usual rules. Their meaning having been so determined, he is bound by them.

The machine of the Johnson patent differs from that of the Dearborn patent in important particulars. In the first place, the carton is presented *over* the paper and pushed *down* by the plunger, carrying the paper with it. In the second place, Johnson moved the cartons forward through the wrapping mechanism, not by an arm having fingers, but by paddles or "flights," moved by an endless chain which was in constant motion. Upon the first of these points Johnson's arrangement proved inferior to Dearborn's and was later abandoned. The second was a valuable contribution.

Seven claims of this patent are here in suit. Several of them are long and complicated. I will deal with them in the same way as I did of those of the Dearborn patent, and for the same reasons.

[8] Claim 8: This is a very specific combination claim to the clutch and detector mechanism of the patent, comprising 15 elements. It is a valid claim. The corresponding machinery of the defendants' machine is to a large extent copied from that of this patent. All the elements of this claim are found in their machine, with the possible exception of the second, viz. "paper-feed ways," and the last, viz. "means actuated by the article to be wrapped as it is carried along on said feed belt for rocking a rock shaft."

The question on this claim is whether these two elements are found in the defendants' machine. The defendants, using the clutch and throw-out mechanism of the patent, control them by a detector working on a different principle. In the defendants' machine the articles to be wrapped do not "rock" the rock shaft. That they shall do so is a plain requirement of the claim, which I do not feel at liberty to disregard. The de-

fendants' copy of the mechanism of the patent is not complete, and on the point under discussion it works differently. I therefore hold that this claim is not infringed.

Claims 17 and 18: Each of these claims incorporates rather specifically the construction and organization of the machine of the patent. In each are at least two elements, viz. the "paper-feed ways *above* said conveyer," and "article-feed means for positioning the article *above* the paper-feed ways," which are not found in the defendants' machine. In it, as has been already stated, the paper is fed over the article to be wrapped. The plaintiff urges that the operation is essentially the same in each case; that whether the article be brought above the paper and forced down with it by the plunger, or under the paper and forced up with it by the plunger, amounts to the same thing. In a complicated machine like this, all the parts are interrelated. It is apparent, I think, that the entire machine would have to be redesigned to change from the downward push to an upward one. It is not a matter of merely taking a part from one machine and incorporating it into the other. If anybody started to make this change in the defendants' machine, nobody knows just what it would lead to, nor what changes would be ultimately required. Under such circumstances, it would be pushing the doctrine of equivalents altogether too far, and disregarding too much the explicit language of the claim, to hold that there was infringement.

Claims 28 and 29: These claims comprise 12 and 11 elements, respectively, and are of the same general sort as claim 26 of the Dearborn patent. They include nearly everything except the bolts and screws which hold the machine together. Neither points out any definite patentable invention. Each is in substance for a particular organization or arrangement of a machine, which is a matter of design. If they are valid, which I doubt, neither is infringed by the defendants' machine.

[9] Claim 35: This claim is in substance for a machine having a conveyer, rotary end folders of the McGirr type, and means for driving the conveyer at a uniform speed, and the folders with variable speed. It brings together the important meritorious points of the Johnson machine. It is valid.

It is infringed, unless the last element is not present in the defendants' machine. To discuss this point it is necessary to describe certain features of the Johnson patent and of the defendants' machine not heretofore re-

ferred to. When Johnson adopted the end folders of the Dearborn machine, he changed their method of operation from oscillating to rotating, giving them at first a constant speed. This did not work well, because the cartons, which were moved past the end folders at constant speed, tended to get by them before the back flap of the paper had been properly folded. To obviate this difficulty Johnson gave the end folders a variable speed by means of elliptical gears, which speeded them up at the proper time. He retained the constant speed of the conveyer. This change proved beneficial.

In the defendants' machine this method of driving end folders is retained, but the conveyer has been given a variable speed, pausing when each carton is being acted upon by the end folders, and speeding up at other parts of its cycle. The drive of the end folders is taken from that of the conveyer, so that they have double variation; i. e., they vary in speed with the conveyer, and also relatively to it, as do the end folders of the machine in the patent. It is argued by the defendants that, as in their machine the conveyer is no longer "driven at a uniform speed," there is no infringement of this claim. The parties are in disagreement whether this variable motion of the conveyer has practical advantage, or is a merely colorable attempt to evade the claim. That the defendants' machines work better, or at least faster, than the plaintiff's, is, I think, established. It is not easy to say how far this superiority is due to this arrangement of the conveyer, and how far to certain refinements in the mechanism of the end folders, which it is unnecessary to describe. In my opinion, varying the speed of the conveyer is probably of some benefit, but not much.

The idea underlying this claim is that the end folders should be speeded up as the carton goes past them, in order to complete properly the fold of the rear flap. This rather basic and important principle is involved in the defendants' machine. The idea was new with Johnson. While, in view of the language of the claim, the point is not free from doubt, as the equities are clearly with the plaintiff, I incline to construe this claim, having in mind the specifications and state of the art, as covering machines in which rotating end folders are variably speeded with respect to the conveyer. So construed, this claim is infringed.

Claim 36: This claim is much like claims 15 et seq. of the Dearborn patent previously discussed. For reasons above suggested,

strengthened by the additional fact that it comes after the Dearborn patent, I am of opinion that it is not infringed.

The plaintiff's allegations of unfair competition by the defendant are not sustained by the evidence.

Decree accordingly in usual form.