## SMITH v. RIDGELY.

### (Circuit Court of Appeals, Sixth Circuit. July 14, 1900.)

#### No. 804.

1. PATENTS—INFRINGEMENT—RIGHT OF LICENSEE TO SUE PATENTEE.

A licensee may sue the patentee, who granted the license, for infringement of the patent within the bounds of the license, in the same manner and with like effect as though the patentee were a stranger.

2. SAME—SUIT AGAINST PATENTEE FOR INFRINGEMENT—ESTOPPEL.

A patentee, who has assigned his patent or granted an exclusive license thereunder, when sued for its infringement, cannot deny its validity; but, subject to such limitation, he may invoke the prior art to limit its scope in defense to the charge of infringement to the same extent that a stranger might.

3. SAME—INFRINGEMENT—WALL-PAPER TRIMMERS.

The Ridgely patent, No. 408,193, for an improvement in wall-paper cutters and trimmers, construed, and *held* limited in its scope by the prior art to the particular location and construction of the spiral spring shown in the specification, the purpose of which was to give a yielding movement to the blade, and, as so limited, not infringed by machines made in accordance with patents Nos. 533,374 and 533,375, subsequently issued to the same inventor.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

This is a bill in equity filed by the appellant, Mark A. Smith, for the purpose of obtaining an injunction against an infringement of certain patents by the appellee, Charles T. Ridgely, and to recover for profits and damages. The parties to the suit were originally joint owners of the patents. They were issued to Ridgely for himself, and as assignor of a one-half interest therein to Smith. These patents were issued, the first on the 25th day of September, 1888, and was numbered 389,901; the second was issued on the 30th day of July, 1889, and was numbered 408,193; and both were for improvements in tools used for trimming wall paper and other like purposes. Prior to July 23, 1894, the said parties were engaged in the manufacture and sale of implements constructed upon the patents above mentioned, under the firm name of Ridgely & Smith, and had built up something of a business. On the day last mentioned, Ridgely made a proposition to Smith to buy or sell all the rights of the other in the partnership, including the stock on hand, the good will, and the exclusive right to manufacture and sell the patented inventions at a price therein named. Smith accepted the offer, buying Ridgely out at the price stated in the latter's proposition, and thereupon the parties entered into the following contract in writing:

"This agreement, made this 23rd day of July, 1894, between Charles T. Ridgely, of Springfield, in the county of Clark and state of Ohio, party of the first part, and Mark A. Smith, of the same city, county, and state, party of the second part, witnesseth that whereas, letters patent of the United States Nos. 389,901 and 408,193, for an improvement in wall-paper cutters and trimmers, were granted on September 25, 1888, and July 30, 1889, respectively, to the first party, who was the assignor of one-half of each to said second party; and whereas, letters patent of the United States No. 480,516 for an improvement in straight edge, were granted to said parties jointly on the 9th day of August, 1892; and whereas, said parties still own said letters patent; and whereas, the party of the second part is desirous of owning the exclusive right of making, using, and vending paper cutters and trimmers and straight edges containing said patented improvements: Now, therefore, the parties have agreed as follows: The party of the first part, for the consideration hereinafter stated, hereby grants to the party of the second part and assigns the exclusive right to make, use, and vend within the United States, subject to the conditions hereinafter named, to the end of the term for which said letters patent were granted, and for such additional time as said patents, and each of them, may be extended, paper cutters and trimmers and straight edges

containing the patented improvements covered by the letters patent above mentioned. In consideration whereof, the party of the second part agrees to pay to the said first party one hundred ($100) dollars for each and every thousand paper cutters or trimmers containing any of the improvements covered by said letters patent made and sold by said second party or assigns, and further agrees on the first days of January and July of each year to make to said first party full and true returns, under oath, of all the paper cutters or trimmers containing said patented improvements sold by him and his assigns during the preceding six months, and to settle in full for the same. It is further agreed that said second party and assigns shall have the right at any time to purchase the entire interest of said first party in the improvements covered by said letters patent for the sum of one thousand ($1,000) dollars, upon tender of which amount said first party agrees to deliver to said second party an assignment or assignments, in writing, conveying to said second party and assigns the entire interest of said first party in and to said improvements covered by said letters patent, and in and to said letters patent therefor aforesaid. In witness whereof the said parties have hereunto set their hands the day and year first above written.                          Charles T. Ridgely.
                                                          "Mark A. Smith."

On the 29th day of January, 1895, Ridgely took out two other patents for improvements in paper-cutting tools,—one being No. 533,374, upon an application filed December 14, 1894; the other, No. 533,375, upon an application filed August 16, 1894,—and thereupon commenced to manufacture and sell paper cutters and trimmers under his new patents, wherein is the infringement complained of. The defendant, Ridgely, denied infringement, proofs were taken, and the case was brought on for hearing. The circuit court found that, in view of the prior art, the inventions covered by the first two patents above mentioned stood within such narrow limits that the instruments manufactured in accordance with the two later Ridgely patents did not infringe. Accordingly a decree was passed dismissing the bill, and the plaintiff has appealed.

Paul A. Staley, for appellant.
H. A. Toulmin, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

By his bill in this case, the plaintiff complained of the infringement of both of the patents first mentioned in the preceding statement as having been originally owned by both parties, and of which he holds the license to use the defendant's one-half interest. But the plaintiff has since then apparently ignored the first patent, and now seeks for the establishment of the rights claimed by him under the second patent, No. 408,193. We shall, therefore, in dealing with the case, proceed upon a comparison of the invention embodied in the second of the patents to Ridgely and Smith, with the inventions covered by the two later Ridgely patents. There can be no doubt that a licensee may sue the patentee, who has granted the license, for infringing the patent within the field covered by the license, in the same manner and with like effect as though the patentee were a stranger. Littlefield v. Perry, 21 Wall. 205, 22 L. Ed. 577; Adriance, Platt & Co. v. McCormick Harvesting Mach. Co. (C. C.) 55 Fed. 288; Walk. Pat. § 400. The plaintiff contends that the defendant, having granted the license to him for a valuable consideration, is estopped from denying that the patent is valid, and we are of opinion that he is right in this. In a case recently decided by this court, it was held that the patentee, after having transferred his interest in the patent, was precluded from denying the validity thereof to the

same extent, and to the same extent only, that a third person would be, subject to the limitation, however, that he could not allege the total invalidity of the patent; the result being that he is still left at liberty to show that, assuming the patent to be valid, it is nevertheless subject to the limitations imposed thereon by the prior art. Subject, therefore, to the limitation just mentioned, its scope is to be tested by the principles which are generally applicable. Noonan v. Athletic Club Co., 39 C. C. A. 426, 99 Fed. 90, and see Manufacturing Co. v. Scharling (C. C.) 100 Fed. 87. Adopting these premises, we will proceed to ascertain what are the limitations of the patent alleged to be infringed, and, having ascertained these, will then proceed to the inquiry whether the defendant's manufactures infringe the patent, the scope of which shall have been ascertained.

The plaintiff's patent, No. 408,193, was for improvements in tools for cutting paper, trimming shades, etc.; and the complete tool contemplated consisted of the combination of a head, B, having a receding face in circular form on one side thereof, in which a diskformed blade, H, was located, the surfaces of the head, one of which is lettered "C," Fig. 1, projecting slightly beyond the blade and on

each side thereof to act against the side of the guide-strip, C', shown in Fig. 2. The blade was mounted upon an arbor fixed in the center of the recess of the head, and there was a gauge, O, extending across the head, and having a vertical shank, R, a channel in the head in which the shank was slidingly mounted, and a spring fitted around the shank, resting upon a shoulder thereof on its upper portion so as to press the gauge downward normally, with a stop to prevent the spring from forcing the shank out of the channel. Figs. 1 and 2 of the drawings are exhibited, which, with the foregoing description, sufficiently explain the basis of the patent. Claim 1 is for the whole combination of elements above enumerated. Claim 2 is for those parts of the tool connected with the head, which consist of the gauge, with a shouldered shank, moving in a channel of the head, —the shank being threaded at the upper end, and having a nut thereon,—and the spiral spring. The third claim involves the combination of the head, the blade, the gauge provided with dependent lips, and a flange extending laterally beyond the lips. Claim 4 combines the head, the disk blade, the arbor, and a jam-nut on the end of the arbor. The fifth is similar to the fourth, but includes, also, a recess in the head around the arbor, in which is located a washer, projecting somewhat beyond the adjacent surface of the head. The defendant introduced evidence to show the prior art, consisting of several patents for paper-trimming tools, and proof of the prior use of another of such tools. A patent to Van Horn for a wall-paper cutter, issued in 1885, shows a head, with an oblong block carrying a disk-blade in an opening or slot in the lower end of the block journaled upon a shaft or bolt extending through the same. From the upper end of the block extended a screw-threaded stem, which projected through the head, and had a nut for adjusting the blade up or down. It had a straight edge or guide, with a channel or slot therein parallel to its sides; and there were flanges extending from the head and running in the slot, and lips or flanges descending from the head to bear against the edge of the guide-strip. This patent contained nearly all the elements, though some of them were in cruder form, possessed by the plaintiff's patent. It had a head, a disk-blade journaled therein, a channel for the vertical oblong block, and the stem in prolongation thereof, the vertical shaft consisting of the oblong block and stem, a guide-strip, flanges running therein, and flanges running on the edge of the guide-strip. It did not contain a spring to give a yielding movement to the vertical shaft carrying the disk-blade, nor did it have the recess in the side of the head for the blade. Recurring for a moment to the fact that the member moving vertically through the head in the Van Horn patent is called a "block," and the stem integral with it is called a "stem," they are the mechanical equivalent of the corresponding member in the complainant's patent,—crude in form it is true, and suggesting the well-known rule that a mere change of form or proportions, or the perfecting thereof, by mechanical skill, does not create a patentable difference. Another earlier patent for improvements in paper cutters was that to Clarke, of August 14, 1888, upon an application filed in February, 1887. This patent

shows a head with a vertically projecting part of semicircular form, in the face of which is a circular depression to receive a disk-blade which is journaled upon a bolt running through an arm let down from the upper part of the upright projection, and into the upright portion of the head. A flange is formed upon the lower edge of the head, to work against the face of the guide-strip; and another flange is constructed upon a lateral projection of the head, to work against the other side of the guide-strip, thus insuring a direct movement of the cutter. Adjustment is made by means of set screws running down through the head and resting at the lower end,—two of them on a strip or gauge moving upon the upper surface of the guide piece, and another upon a roller also moving on the guide piece. There is a handle to operate the cutter attached to the head. In this patent, it will be observed, there is no vertically moving member, as in the Van Horm patent, and no spring to affect the operations of the cutter. Some improvements were made upon this cutter in a patent to Clarke & Robinson, of date March 18, 1890, upon an application filed June 13, 1888, relating mainly to the means for adjustment vertically of the knife or blade. This was effected by pivoting one end of the frame in which the blade is fixed to a vertical standard attached to the bed or gauge, securing the other end to a like standard affixed to the other end of the bed of the machine; this last standard having a clamping screw projecting at one side, on which moved a perpendicular slot formed on that end of the knife-carrying frame. By moving the slotted end up and down on the shank of the screw, and tightening the latter at the proper position, the knife is then held vertically at the place desired. Another paper trimmer, called the "Union Paper Trimmer," one of which was produced in evidence, is shown to have been manufactured at Meriden, Conn., and to have gone somewhat into public use as early as 1886. This trimmer was a simple affair, but it had a head with a disk-blade journaled therein; the head being supported by elliptical springs having rollers at either end, thus affording means for depressing the blade as desired by bearing down upon the frame carrying it. Washers were put upon each side of the blade shaft, to prevent friction between the head and the blade. Rude handles were cast upon the frame for the purpose of manipulating the tool. The cutter was used in connection with a guide-strip. Objection was made to the evidence relating to the Union trimmer at the time it was taken, for the reason that no sufficient ground was laid for it in the answer, and notice was given that a motion would be made to strike out the deposition, and a motion to that effect was subsequently filed. But the motion does not appear to have ever been brought to the attention of the court, and we therefore infer it was abandoned.

From what has been stated, it appears that when Ridgely applied for the patent, No. 408,193, he must be presumed to have known that paper trimmers had already been made in which there had been employed a head or frame, having a recessed face at one side thereof to receive the blade, whereby surfaces were left at each side of the blade to act against the edge of the guide-strip; a disk-blade journaled in

the recess of the head; a gauge extending across the head; a knife frame having a vertical shank slidingly mounted in a channel made for the purpose; a spring to support the knife-carrying frame, whereby a varying pressure could be put upon the knife; washers upon the knife shaft between the knife and the frame to ease the friction; and a handle wherewith to manage the cutter. We have in a preceding part of this opinion stated what Ridgely claimed for his invention, and, by comparing it with the foregoing statement of the condition of the art at that time, it is quite apparent that there was nothing new in his invention, except the introduction of the spiral spring into the channel of the cutter head, whereby the objections to the rigid construction of former cutters were overcome, and a yielding movement given to the blade,—a property thought desirable in the art. But this, too, had in a certain way already been accomplished,—apparently, however, by rather clumsy and inadequate means. The means provided by him operated in a somewhat different way, and produced better results. To the extent of this improvement his patent was valid, but it obviously limits its scope to the particular means invented by him. The following considerations will demonstrate the correctness of this conclusion: It is a settled rule of law that the mere combination of several parts, chosen from old machines in the same art, to perform in a new machine the same functions which they performed in the old machines, where the adaptations are such as require only the skill of a mechanic trained in the art, is not patentable as an invention. In the Union Trimmer the spring supports the head, and through it the blade which is fixed within it. The spring rests upon rollers which move upon the upper face of the guide. If for these rollers we should substitute the pressing strip found in the Clarke patent, we should have substantially all the elements involved in that part of the Ridgely patent, No. 408,193, associated in the operation of his spring device. And the other elements of his combination were all old, or at most were but mere mechanical improvements of old forms, not affecting their mode of operation. Do the trimmers made under the new Ridgely patents infringe his former patent, as limited to the specific means employed in the latter for giving effect to the advantages secured by the introduction of the spring between the blade carrier and the gauge, or "pressing strip," as it is called in the Clarke patents? In the first of the new patents the head in which the blade is fixed is pivoted upon the gauge at one end thereof, and a coiled spring is turned around the pivot, and connected at one end thereof with the gauge, and at the other with the head, and so adjusted that normally it tends to throw the gauge and head apart. This tendency is overcome by pressure upon the other end of the head, which causes the blade to descend to the desired position. An incidental advantage is the leverage upon the blade which is obtained by this construction. There is no vertical shank upon the gauge or channel in the head in which the shank is slidingly mounted, as in the older Ridgely patent. In the second of the two new patents the gauge and head are pivoted at the end, as in the first; but the spring is transferred to the other end, and coiled around a pin attached to that end of the head, descending into a hole or channel in the gauge. The pin does not move vertically, but

in the arc of a circle; the movement being controlled by the fixed pinion on which the other end of the head or frame revolves. If the patent alleged to be infringed had been of a primary character, or one embodying a distinct and substantial advance in the art to which it relates, we should probably be able to find in the new Ridgely patents, and particularly in the last one, the equivalents of the elements combined in the patent now held by Smith, as was done by this court in reference to the important and very novel inventions in the cases of McCormick Harvesting Mach. Co. v. C. Aultman & Co., 37 U. S. App. 299, 16 C. C. A. 259, 69 Fed. 371, and Bundy Mfg. Co. v. Detroit Time-Register Co., 36 C. C. A. 375, 94 Fed. 524; but as the plaintiff's patent is sustained merely for the peculiar location of the spring in the trimmer, effecting the specific mode of operation resulting therefrom, we think the defendant's patents do not show an infringement thereof. To hold otherwise would be to admit that the plaintiff's spring device covered a spring located anywhere in the trimmer for the purpose of modifying the effect of pressure upon the head and blade. This we cannot do, in view of the similar device in the Union paper trimmer.

The claims in the plaintiff's patent, other than claim 1, stand on equally narrow ground. The second relates only to the spring device, and the special means set forth therein for operating it, among which is a shouldered shank on the gauge "screw threaded at its upper end, and provided with a nut." Nothing of the kind is found in the defendant's structure. The third is for a gauge extending across the head and "mounted in the head," referring to the vertical shank thereof sliding vertically in the channel of the head. The defendant does not employ a gauge having such characteristics. The fourth includes "a disk-blade having a central bore constructed with a seat"; that is, countersunk on the inner side to receive the correspondingly formed head of the arbor on which the blade turns. The bore of the defendant's blade is uniform through its thickness, and is not constructed with a seat. The side of the disk-blade is flat at that place, and so is the inside of the head of the arbor. It may be that this peculiar construction of the plaintiff's blade and arbor is not, as matter of fact, material; but it is claimed in that specific form in the patent, and in the specifications the description of the blade and the arbor is not general, but of this form only. It cannot, therefore, be claimed that it is immaterial,—certainly not where the patent stands on such limited grounds.

As to the fifth, it is not contended that the defendant's patents infringe it. But counsel for the plaintiff refer to certain evidence in the record from which it appears that the defendant, prior to the commencement of the suit, caused to be made 380 trimmers according to his new patents, and they contained, also, a washer resting in a recess in the head bored out around the arbor hole; and upon this proof it is claimed that the plaintiff is entitled to an injunction to restrain the defendant from infringing the fifth claim of his patent. In the Union paper trimmer was a washer at the same place for the purpose of holding the blade away from the head and preventing friction between them. The modification of this in the plaintiff's patent consist-

ed in boring a seat for the washer in the head, so that only a part of the thickness of the washer should project into the space between the blade and the head. There was nothing new in mechanics in forming this recess for the washer. Besides, this claim calls for the disk-blade and the arbor of the specifications, none other being therein suggested than those particularly described as parcel of the substance of the invention; and these, as we have already said, are not such as are used by the defendant. Upon the whole, we are of opinion that the decree of the circuit court should be affirmed. It is so ordered.